Thank you. I'd like to reserve three minutes, please. Good morning, Your Honor. May it please the Court? My name is Tony Mary. I represent Neal Javery. With respect to the appeal that we've brought today in this ERISA matter, our appeal principally raises two issues. The substantive issue, of course, is whether Mr. Javery was disabled in November of 2005 from his job at Lucent Technologies as a software engineer. And the procedural issue that we've raised here is whether the district court abused its discretion when it remanded the case after it first reached a decision. Beginning with the procedural issue, the history of the administrative proceedings that occurred here is relevant. Javery applied in November of 2005. He placed his mental health at issue in that application, both with respect to his statements and with respect to the two physicians that submitted statements. Cigna denied the claim. Javery appealed against it, submitted additional evidence. Cigna again denied the claim based upon a medical direct review and the key language with respect to the mental health. And let me stop and say here, there's a wealth of information supporting the fact that Mr. Javery is physically disabled. But in my view, the evidence that he was mentally incompetent to work is overwhelming, and so we've kind of focused on that. With respect to the Cigna's decision on appeal, and I quoted at page 12 of my opening brief, the medical director said, while these limitations being mental were noted, we've not been provided with mental status examination findings, neuropsych testing or treatment records supporting a cognitive impairment. So Javery appealed again. And this time when he appealed, he put in the wealth of mental illness evidence that I'm talking about. Mr. Murray, just one quick question. Sure. This is sort of a procedural question. I think there's some medical evidence that is from the 2007 time period, if I'm correct. Correct. How does that relate to the disability time period, which I understand to be November of 2005 to 2006? Correct. How should that 2007 evidence be considered by this court? Well, I'm not here to say a hard and fast rule that it's irrelevant, because I think if you look at it in context, for example, the fact that he, we've got a lot of mental health evidence in 2005, and the fact that he continued and was hospitalized and treated for mental illness in 2007, goes to confirm the 2005. I think that's fine. On the other hand, I think he developed cancer or some other physical thing in 2007. I don't think it's fair to look at that with respect to the 2005 claim. And when we discussed the Social Security finding in our brief that he was disabled, we did note in our brief that some of the findings from the Social Security Administration were based upon subsequent stuff. Now, if the court rules here in our favor, and the only issue we're up here on at this point is whether Mr. Javeri is disabled from his own occupation. As the court's probably familiar with. The second part, isn't it? The second part for any occupation. Any occupation that's not before you now, it's yet to be determined. So is his occupation, I think I know. His occupation was as a software engineer. What did he have to do physically? Physically, the principal problem he had physically was sitting all day. I think the record shows that he worked 8 to 10 hours a day. And there's evidence that because of back problems and stuff, he had trouble doing that. But there's also evidence that his two treating docs in November of 2005 said, either due to medication or his just being nuts, he couldn't maintain the concentration that was required to work. And we have that in November of 2005 from Dr. Holtzmeier and Dr. Seymour. We have Dr. Sagi who certified all through the short-term disability period that he was disabled from working. We have the... What was the matter exactly with his back? Do you have a disc? He had, the imaging studies showed severe degenerative disc disease. And there was an EMG that showed that he had some peripheral neuropathy and some things like that. So his physical claim is amply supported. And, in fact, when he filed a workers' comp claim at the same time, it never went anywhere, partly because Lucent sent him for an evaluation by Dr. Skaletsky. And Dr. Skaletsky said, basically, his disability is not attributable to his work. And then even Skaletsky said, but this guy's got a lot of mental problems. So the... Well, you also have sort of the opposing opinions of doctors, was it Kim and Goldman, that Mr. Javeri was not disabled? Okay. They were, I guess, I think, non-treating physicians. Yeah, they were not only not treating physicians, they were non-examining. I should say non-examining. This goes up against the problem that the courts addressed in several other cases, as between, in our case, one, two, three, four, five, six treating physicians who've all determined that Javeri's disabled. We've got an opinion from a neurologist that says he's not disabled, but I haven't examined him. And, of course, the problem with that is in order for the neurologist to make that claim, he has to discount Javeri's credibility as far as his physical statements. Now, we do have the administrative law judge. If the court gets to the point of considering the remand evidence, we've got the administrative law judge's opinion that said he was credible. The problem we have with the psychiatrist is this court has said so, and several other courts have said, you know, when it comes to mental illness, you can't tell by reading the files. You've got to either go by what the treating docs say, or you've got to examine him yourself. And that's the thing here. Cigna and Lucent in its plan, they could have examined him. They could have sent him for a functional capacity evaluation. You know, how much can he stand? How much can he sit? For a mental, they could have done their own mental status. They didn't. And some of the, even some of the mental evidence is the Beck Depression Inventory. That's kind of recognized as as objective as you can get on mental illness, and that's pretty clear. So under the definite what's before the court, if he can't sit for eight hours a day in front of a computer screen, he's disabled under this policy, is that right? Correct. Seems to me like you guys are overcomplicating this. I don't disagree with you, Your Honor. Judge Frost did not find the physical evidence persuasive, so that's why he remanded it. And part of the problem with the district court's opinion, and in fairness to the district court, they don't really get many de novo ERISA cases. District courts are used to looking at either deferential review in an ERISA case or they're looking at summary judgment cases, and so they look at the evidence kind of differently. And I think the district court here, because the language of the court's opinion in several cases, both in the first opinion and the second opinion, talks about Cigna being reasonable and Cigna being this and Cigna being that. And I think it would be helpful for the district courts generally to get a clear opinion from this court on what they're supposed to do on de novo review. Not that the court hasn't more or less said that before, but they've never said it in clear terms. Look, when it's de novo review, it's almost like a bench trial on the papers. You just take a look and, you know, who wins. Well, my sense of this case, correct me if I'm wrong, is that in addition to the allegedly disabling back pain, that maybe the more disabling aspect of Mr. Gervais' medical situation was sort of the psychological, emotional profile. He's a software engineer, requires something like 70 to 75 hours a week, working with these very complex programs, requires an incredible amount of acuity. He's been diagnosed with some pretty serious emotional disorders, bipolar disorder. Paranoia, schizophrenia. So it's sort of a combination of the physical and the mental, and then also how they work together. Interaction. And the third component is the medications, because he was taking some heavy-duty medications for his back. There's some references in the medical records to the fact that his medications are affecting his ability to work. This is a guy that tried to sell the 2008 election on eBay. So he isn't all there. And just to close the loop on the remand, I think the district court abused its discretion in remanding it because, and once again I think that would be regardless of how you come out on this issue, I think it would be helpful to make it clear to the district courts what their prerogatives are. I'm not going to say that there's never a basis for a remand in a de novo review case, because there might be. But I think in this case, Cigna had a chance once on two different appeals, but specifically on that last appeal. They had a shot at the mental illness stuff. So there's no reason for the district judge to give them another shot at it, number one. So I would argue, even if this was a deferential review case, that the district court was in error in remanding it, because the fact that Cigna chose not to respond, that's not the plaintiff's fault. But more importantly, on de novo review, if you've got all the evidence you need, there's nothing else you need. So I have a little time left, but in light of the lack of questions,  Thank you, Your Honor. Good morning, Your Honors. If it pleases the Court, I'm Jim Stone with Jackson-Lewis. I represent the Lucent Technologies Long-Term Disability Plan. I'm assisted by my able colleague, Dan Messelhoff. We're pleased to be here today. I think that if I was just listening to Mr. Murray's argument today, and that was a totally accurate statement of all the facts, I would be convinced. However, the trouble with this case, and why the court below, the district court, struggled with this case so much, is there's a lot of contradictory evidence. There is a lot of medical reports that are inconsistent with this analysis. We have to start with the plan itself. The plan definition, and of course that's what we're here to determine, whether Mr. Javery is eligible for benefits under the plan calls for, and it's a strict standard. An individual has to be disabled from performing his job for the entire 52 weeks following the conclusion of his short-term disability, at the beginning, throughout, and at the end. During the early periods, yes, one of his treating physicians said that he had back issues. He also said at times he was improving very nicely. He would be able to return to work soon. Another of his treating physicians said he would benefit from returning to work. He just needed to get up and move around a little bit, and there's no evidence in the record that he couldn't get up and move around a little bit. There are other doctors who examined him during this period. Are you saying that in relation to his degenerative disc disease or his mental health issues, when doctors are making these various statements, are they making in reference to both conditions or just one condition? Well, looking at the case today, many years later, the mental health issue, as Mr. Mary has articulated, has taken a lot of the focus in the briefing. But when Mr. Javery first applied for disability, mental health was barely mentioned. There were one or two passing references in a couple of the doctor's statements, but in general it was focused on his back issue, that he had a condition. And a number of doctors, Dr. Grodner and Dr. Ward, concluded that he did not have any significant degenerative back disease. They noted maybe some subjective reporting of symptoms, but there was little evidence, I wouldn't say no evidence, but limited evidence of severe degenerative back disease. And even one of his own doctors, Dr. Seymour, stated that he thought that he could benefit from returning to work, that that would be the best thing for him. The mental health issues really did not arise to any serious degree until Mr. Javery lost a lot of money in the stock market and day trading in 2006, around August of 2006. And the first note, and this is well into the disability period, the qualifying period is from November 2005 to November 2006. So we're eight months into this period. And at that point, Mr. Javery... Excuse me for interrupting, but some of these doctors whose opinions you're making reference to, go back as far as 2002. And, you know, his condition was changing and evolving, and he would see these various doctors. And I guess the period of disability is this November 2005 to 2006. I agree with that, Your Honor. So some of these earlier statements may not really be determinative. I think, with all due respect, Your Honor, Dr. Skoleski examined him in August 2005. Dr. Grodner examined him in July of 2006. Dr. Ward examined him a little bit later. But they're all, I think, relevant to the time period. But even Dr. Seymour, his own physician, during, I believe it was in 2006 suggested, or late 2005 suggested that he would benefit from returning to work. So I think the reports see the struggle that, again, the district court had with this is you have a lot of contradictory evidence. And at the time of the initial review, there was very little mental health evidence. And the court was concerned. And the court remanded it, I think, properly, not because they wanted to give Cigna or, excuse me, really Lucent, because Cigna is just an administrator. This is Lucent's plan. This is an ERISA plan, not an insurance policy. Not because they wanted to give them two bites at the apple. The court didn't feel there was enough evidence, particularly on the mental health issue, to make a decision. You couldn't. The court said, opined, that if it had to make a decision based on preponderance of the evidence, it did not favor Mr. Javery at that time. But it felt that there should be more record developed. And Mr. Mary, on Mr. Javery's behalf, submitted more evidence. And the company sent loose, I should say the plan, sent the files for what is sometimes called a meta-analysis, but a detailed review by two psychiatrists. Well, you know, I only see one doctor in the 2005 frame, and thereafter saying he might be well-advised to go back to work. That's Dr. Seymour. This is one of his treating physicians. All these other physicians who examined him seemed to suggest that, you know, in their opinion he's totally disabled and can't sit, walk, or stand, and he should not go back to work. Do you have, with respect to his back condition, other than Dr. Seymour, do you have any, maybe I missed something here, or any of these other doctors from 2005 forward who said he should be able to work? No. Yes, Your Honor. Thank you. Yeah, and the record here is complicated, and, of course, the case has been going for a long, long time. But Dr. Skoleski, on August 1, 2005, found no evidence of radiopathology. I'm probably mispronouncing this, but radiocooled pathology. And Dr. Grodner, on July 10, 2006, right in the middle of this disability period, reported no motor weakness and that general physical examination was unremarkable, except for some redundant motion of his back. So they both opined that he could do sedentary and even intermittent light activity work. So there were those opinions by physicians who, in most cases, did examine him and who did find that he was not. Do you agree that the duties of his occupation were to sit in one place all day, maybe with a couple of breaks, and work on a computer? We would agree it's largely sedentary, but he certainly would not agree that he could not get up and move around occasionally. In fact, most software programmers do that. It's like practicing law. You need a mental break once in a while. You need a physical break once in a while. How many hours a week did he have to work? The job requirement was normally 8 hours a day, 40 hours a week. Like most software engineers, he did sometimes work longer, but that was not a fixed requirement of the job. So if he had been able, based on the examining physicians, who said he could work a sedentary job with occasional breaks, we feel that that would have been easier. And he was writing computer code? Is that what he was doing? Well, software programming. I'm sorry, Your Honor, I don't know exactly. Well, that would require computer code. That would require me actually. I'm not a technology either. That would require me doing more than turning it on. A job that requires a lot of concentration. It's a job that certainly requires some concentration. If he was in enough pain that he couldn't concentrate, then he's disabled under this policy. Well, if he was in enough pain that he could not concentrate on a regular basis. But another thing that's worth noting is that his doctors recommended, of course, a pain management, which he did not follow. It was never clearly articulated why he didn't follow it. There was some speculation, I think, by his attorney that he couldn't afford it, but at that time he had his coverage, so it doesn't make any sense to us why he couldn't have adopted some routine pain management protocols. But we do feel, again, the mental health, if we go back to the mental health issue, there was very little evidence until August of 2006. And then what we have is an encapsulated event. He was clearly hospitalized for approximately three weeks, three and a half weeks, off and on. And that was after he lost a lot of money in the stock market. But that was an encapsulated event. And the thing that Dr. Rimm and Dr. Goldman both put a lot of emphasis on in their file review, and while, yes, they did not examine the patient, and we understand that that's an argument Mr. Mary made, by the same token, they, unlike all the other treating physicians, had access to the entire administrative record. They looked at everything. And if you look at their reports, they review everything, including his treating physicians. Well, we don't know that they looked at everything. They had the opportunity to look if they were willing to take the time. They stated they did. They commented on most of them. In fact, they tried to call and, in fact, many cases did reach by phone the treating physicians as well as others. These doctors, were they on the company payroll? They were independent. They don't have to do what the experts do in a personal injury case and list all the other cases. No, they're not like expert witnesses. And ultimately, I'm not trying to make light of the issue, and this is a serious case, but there is not the kind of massive financial incentive on the plan here other than to honor its own provisions. I mean, there's not enough financial incentive to, I think, impute some kind of nefarious influence. Let's put it that way. And perhaps unintentional, but nevertheless. But I think you have to note that what they concluded was that there is no ongoing medication for psychological issues. None. There's no ongoing psychotherapy. None. There's no group therapy. There's no continuing inpatient or outpatient therapy. I mean, there are many people with, I think the court can take judicial notice, the New York Times has reported 12% of all adult Americans are on antidepressants. A significant proportion, I think something like over 40%, are undergoing or have undergone counseling. Mr. Javery has not done any of those things other than for these encapsulated events. He got examined. He got people to support his disability claim. But there was a lack of collaboration. There was a lack of treatment notes. He never took the Minnesota Multiphasic Inventory Test, the well-known psychiatric test. There is no progress notes. That's what you typically find in a mental health claim. You'd see somebody undergoing treatment, undergoing probably for what he claims he's got, which is multiple conditions, intensive psychotherapy. You'd certainly have some degree of medication. None of that occurred here. There's just one encapsulated inpatient stay and then some supporting comments from his treating physicians and one or two one-off examinations in support of his position. Contrary to that, there are doctors who examined him, psychologists and psychiatrists who examined him during the same period who found he did not have severe mental issues. We're not here to say that Mr. Javory has no back issues, nor are we saying that he has no psychological issues. However, the standard under the plan is that he has to be disabled for the entire 12 months from performing his job, not for the beginning, the middle, and the end. We can be sympathetic as human beings as we are to his condition. You're not saying that his back condition and his psychiatric condition are discrete and separate conditions, are you? Because a lot of these psychologists and psychiatrists are saying that the problem with him, the things that are interrelated in that he's having pain management problems and pain disorder that's a part of his anxiety and depression. In addition, at least one said he has traumatic stress disorder and he's been diagnosed as bipolar and all these other rather severe conditions. So it would seem that these conditions are sort of cumulative to some extent. We believe, and of course this court has to review this de novo too, and we urge the court to look at a detailed record. I believe one of your honors made that decision in the Wilkins case a while ago. And we urge you to look at the whole record. But certainly his back injury gave rise to some, I think, fairly minor psychological issues at the beginning. He wasn't able to work. It's natural to have some issues from that, or at least he was out on short-term disability. But all the severe mental health issues really did not arise until the time he lost the money in the stock market, and so we're only at the very end of this one-year disability period. So we don't believe that you can really draw a reference that, okay, he had severe back problems, which itself are significantly contraindicated by the evidence in the file, and then that caused all these other severe mental health issues. We think there is an encapsulated event of an inpatient stay in late September and October of 2006. There are some controversial claims of back problems. We don't deny it, some back problems. But, again, numerous physicians, at least three during this period, found that his back problems were either minor or lacked objective evidence. And I think you've got those two discrete events, and it doesn't satisfy the definition under the plan for a long-term disability. I'd also like to mention, just for 15 seconds, we do have an argument on judicial estoppel. Mr. Jabry did not disclose this case in bankruptcy filing. In fact, after we filed a motion to dismiss, he did not amend his filing for up to six months. He did sign it. He attempts to blame his attorney. We don't think that's appropriate, and we think he should be judicially estopped from the- Well, his attorney said that he was advised by the client, and if there was a problem, the attorney failed to put that into the bankruptcy filing. But Mr. Jabry signed the bankruptcy filing and had the assistance of his wife in doing so. While it's not- But the evidence that he disclosed information to his attorney, his attorney didn't put it in the bankruptcy petition. As a lay person, he doesn't know what goes in there. That's pretty much the facts on- But I think the standard is in a bankruptcy petition that you ultimately are responsible. I think this court has ruled to that effect that you ultimately are responsible because there's this bankruptcy, there's another bankruptcy it's only alluded to in the record, a Chapter 7 bankruptcy, that the creditors may have- or the trustees, I should say, may have interests in the proceeds. And I think he ultimately does bear responsibility. I think the court should dismiss on that basis as well. Okay. Thank you, Mr. Jabry. Thank you, Your Honor. Thank you very much. Thank you again, Your Honor. I'll be brief, but I need to address the notion that the mental illness wasn't in this case from the beginning. I have here in the record, in the first record, at pages 508 and 509 is Dr. Seymour's report. The second page, 509. And this is a lucent form. It says, Long-term disability plan for lucent technologies. Attending physician's statement of disability. Page 2, question 31. Please check the appropriate box regarding patient's mental or nervous impairment. Box checked is box 5. Patient has significant loss of psychological, physiological, personal, and social adjustment. Severe limitation. Date, November 22nd, 05. That's Dr. Seymour. That's page 508 and 509. Dr. Holtzmeier is at 510 and 511. Same thing. Same number, question 21. Box checked, class 5. Severe limitations. So it's simply incredible to argue that this wasn't put at issue right from the get-go. With respect to Dr. Seymour's statement that Javeri could benefit from a return to work, he subsequently wrote a letter, that's in 186 in the record, complaining that Cigna was taking his comment out of context. The last comment I'll make is the argument was made that Javeri has got to establish that he was disabled throughout the 180-day elimination period. That's true in most plans, but it's not true in this one. Section 2.4 of the plan, page 05 of the original record, says that you've got to be disabled for the one-year period commencing immediately after the 26-week period. So, no. In most cases, yeah, you've got to show you're disabled through the whole period. Not in this plan. Okay, the plan calls for benefits for a year. How much a month would he be getting? How much benefit? How much a month, yeah. Roughly. Probably somewhere in the $4,000 to $5,000 range. I think he was paid about $75,000, and his benefit would be 60%. But reduced, set off by Social Security, which he's also receiving, although I'm not sure what the timing is. So maximum of $4,500, maybe as low as $3,000. All right. Thank you, Your Honor. Okay, thank you, counsel, for your arguments today. We very much appreciate them. The case will be submitted.